IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| UNITED STATES OF AMERICA | |
| | : |
| | |
| v. | : Civil Action No. DKC 11-0385 |
| | : |
| ABDUL FADUL, et al. | |
| | : |

**MEMORANDUM OPINION**

Presently pending and ready for review in this healthcare
fraud case is the unopposed motion for summary judgment filed by
the United States of America ("the Government").  (ECF No. 31).
The issues have been briefed, and the court now rules, no
hearing being deemed necessary.  Local Rule 105.6.  Because the
evidence establishes that the Government is entitled to judgment
as a matter of law only as to its claim for payment by mistake
of fact against Defendant Cardio Vascular Center ("CVC"), the
motion will be granted in part and denied in part.

**I.  Background**

**A.  Factual Background**

This case arises out of the billing practices of CVC, an
entity owned by Defendant Abdul Fadul, M.D.  Except as otherwise
noted, the following facts are undisputed, as drawn from the
evidence submitted by the Government (including the
interrogatory responses of Dr. Fadul and CVC) and the admissions
and denials made by Dr. Fadul and CVC in their answer.

### 1.   CVC & Its Business Model

Dr. Fadul is a licensed cardiologist who practiced medicine in the state of Maryland until 2009. (ECF No. 31-3, at 3). In addition to his personal medical practice, Dr. Fadul owned CVC, a limited liability company organized under the laws of the state of Maryland that closed in 2009. (ECF No. 31-30, at 8).[1] At all times relevant to this action, Dr. Fadul served as CVC's operating officer, and the entity had no other members or officers. (*Id.* at 2).

CVC provided mobile diagnostic services to residents of nursing homes in the greater District of Columbia region. CVC's business model generally functioned as follows. (*See generally* ECF No. 31-4, Hales Aff.; ECF No. 31-16, Mathews Aff.). When a treating physician ordered an imaging test (*e.g.*, an ultrasound) to be performed on a nursing home resident, the nursing home contacted CVC to perform the test. After obtaining a copy of the physician's order, CVC assigned one of its mobile technicians to visit the nursing home, review the patient's chart, confirm the physician's order, and perform the test requested. After completing a test, the technician

---

[1] In the complaint and first amended complaint, the Government alleged that CVC is a partnership owned by Dr. Fadul and his wife. (ECF No. 1 ¶ 10; ECF No. 15 ¶ 11). In its interrogatory answers, however, CVC represents that it is a single-member limited liability company. (ECF No. 31-30, at 8).

electronically transferred the results to a radiologist who had been assigned by CVC to read the test and produce a report. Neither the mobile technicians nor the radiologists were employed by CVC, but instead functioned as independent contractors who received compensation on a per-test basis. To this end, technicians submitted daily log sheets to CVC indicating the tests they had performed that day. CVC used these log sheets to compensate the technicians and (as discussed in detail below) for billing purposes.

In exchange for its services, CVC received the patient's right to reimbursement from his or her health insurance company. Many of the patients who received services from CVC participated in either the Medicare or Medicaid Programs.[2] To reimburse health care providers, private and public insurers (including Medicare and Medicaid) use an alphanumeric coding system established by the American Medical Association and published in the Current Procedural Terminology ("CPT"). Each CPT code consists of five digits and corresponds directly with a medical procedure for which the insurer provides payment. For example,

_____

[2] Medicare is a 100% federally subsidized health insurance system for disabled persons and persons who are 65 or older that allows enrollees to be reimbursed for 80% of medical expenditures or to assign the right to reimbursement to a healthcare provider. Medicaid is a similar program in which the federal government and the fifty States share the cost of medical services provided to qualifying disadvantaged persons and families.

CPT 76700 corresponds to "Ultrasound, abdominal, real time with image documentation; complete." (ECF No. 31-26, at 13). The AMA publishes a new set of CPT codes each year. (ECF No. 31-23, Duszak Report, at 4). Dr. Fadul avers that Maryann Ayers, who served as the office manager for his personal practice, purchased a CPT manual every year to serve as a reference "for both CVC and [his personal] office to check the codes in use and to check for new updates." (ECF No. 31-3, at 7).

According to the Government's expert, the introduction to the CPT manual instructs healthcare providers to "[s]elect the name of the procedure or service that accurately identifies the service performed. Do not select a CPT code that merely approximates the service provided." (ECF No. 31-23, Duszak Report, at 4). The same instructions also advise that "[a]ny service or procedure should be adequately documented in the medical record." (*Id.*). In the field of radiology, the Centers for Medicare and Medicaid Services generally require an order from a patient's treating physician to perform imaging tests in the non-hospital setting. (*Id.* at 2).

CVC used billing software called Medical Mastermind to bill insurance companies (including Medicare and Medicaid) for its services. (ECF No. 31-4, Hales Aff. ¶ 10). CVC's billing department inputted the tests listed in a technician's log sheet using non-CPT alphanumeric codes that were unique to Medical

4

Mastermind. (*Id.*). Upon the entry of certain singular Medical Mastermind codes, CVC's billing system automatically rendered two CPT codes to be billed to the insurer for reimbursement. (*Id.*). The instant lawsuit arises from CVC's automatic "combination" billing of CPT codes for two types of tests.

### 2.   CVC's Billing Practices for Abdominal Ultrasounds

The first practice at issue in this lawsuit is CVC's billing of abdominal ultrasounds during the period from 2004 through 2009. When a technician indicated on her log sheet that she had performed an abdominal ultrasound, the CVC billing department selected the Medical Mastermind code "ABD1." (ECF No. 31-4, Hales Aff. ¶ 11). Selecting this single code automatically caused both CPT 76700 (abdominal ultrasound) and CPT 76770 (retroperitoneal ultrasound) to be billed. (*Id.*).

The Government presents evidence establishing that CPT 76700 and CPT 76770 describe two distinct tests that require separate physician orders and are rarely performed on the same patient on the same date. From 2005 to 2009, the CPT manuals stated that "[a] complete ultrasound examination of the abdomen (76700) consists of real time scans of the liver, gall bladder, common bile duct, pancreas, spleen, kidneys, and the upper abdominal aorta and inferior vena cava including any demonstrated abdominal abnormality." (ECF No. 31-26, at 2, 4, 6, & 8). By contrast, the manuals stated that "[a] complete

ultrasound examination of the retroperitoneum (76770) consists of real time scans of the kidneys, abdominal aorta, common iliac artery origins, and inferior vena cava, including any demonstrated retroperitoneal abnormality." (*Id.*).[3] The Government's expert, Dr. Richard Duszak, Jr., M.D., explains that "[a]lthough structures in the abdomen and retroperitoneum overlap in part, dedicated ultrasound studies of these regions are readily identifiable as separate and distinct to even entry level imaging professionals." (ECF No. 31-23, at 2-3). Dr. Duszak further opines that, in clinical practice, it is "exceedingly rare" for both tests to be ordered for or performed on the same patient on the same date. (*Id.*). Thus, according to Dr. Duszak, although "there is some overlap of body parts between abdominal and retroperitoneal ultrasound examinations," the CPT manual's instructions "require[] the use of the code which accurately describes the services performed" and "preclude[] 'double dipping' for component services nominally described in parts of two codes." (*Id.* at 5).

Dr. Duszak's opinion is supported by the testimony of several former CVC mobile technicians. For example, Donna

---

[3] The CPT manuals in place from 2003 through 2006 describe CPT 76700 as "Ultrasound, abdominal, B-scan and/or real time with image documentation; complete." (ECF No. 31-26, at 2, 4, 6, & 8). The same manuals describe CPT 76770 as "Ultrasound, retroperitoneal (eg, renal, aorta, nodes), B-scan and/or real time with image documentation; complete." (*Id.*).

Mathews, who served as the head technician, avers that CPT 76700 and CPT 76770 are codes for different tests. (ECF No. 31-16, Mathews Aff. ¶ 9). Ms. Mathews and another CVC technician also aver that CVC rarely received physician orders to perform both tests on the same patient and they never performed tests without a physician's order. (*Id.* ¶¶ 7, 9; ECF No. 31-19, Collins Aff. ¶¶ 5, 7). Ms. Mathews further testifies that CVC technicians only received payment for one study when they performed an abdominal ultrasound and that "only [an abdominal ultrasound] should have been billed." (ECF No. 31-16, Mathews Aff. ¶ 9).

Nonetheless, on 2,090 occasions during the period from 2004 to 2009, CVC requested reimbursement from Medicare for both CPT 76700 and CPT 76770 for the same patient on the same date of service. (ECF No. 31-35, Marrero Aff. ¶ 13). Medicare paid out $145,010.09 for services billed as CPT 76770 as a result of these claims. (*Id.*). During the same period, CVC submitted 202 such requests to Medicaid, resulting in reimbursements for CPT 76770 totaling $11,544.24. (ECF No. 31-32, Hammond Aff. ¶ 7).

The Government identified several statistically valid random samples of these claims and subpoenaed the corresponding medical records to perform an audit. (ECF No. 31-35, Marrero Aff. ¶¶ 14, 15). As to those claims for which it obtained medical records, the Government concluded that there "was no justification for any of the complete retroperitoneal

ultrasounds (CPT code 76770) billed by CVC . . . because there was no separate radiology reports for these services or any physician orders for these services." (*Id.* ¶ 18).[4]

### 3. CVC's Billing Practices for Duplex Ultrasound Tests of Extremity Veins

The second practice at issue here is CVC's billing of duplex ultrasound tests during the period from 2004 through 2009. When a CVC technician indicated on her log sheet that she had performed a bilateral lower extremity venous study, the CVC billing department selected the Medical Mastermind code "VEN1." (ECF No. 31-4, Hales Aff. ¶ 11). Selecting this single code automatically caused both CPT 93970 (venous duplex ultrasound, bilateral) and CPT 93965 (non-invasive physiologic study of extremity veins) to be billed to the patient's insurer. Similar results occurred when a CVC technician reported that she had performed a unilateral lower extremity venous study: the CVC billing department selected the Medical Mastermind code "VEN2," which caused both CPT 93971 (venous duplex ultrasound, unilateral) and CPT 93965 to be billed.

---

[4] As a result of this audit, the Government also concluded that nearly all of the complete abdominal ultrasounds (*i.e.*, CPT code 76700) billed by CVC "did not meet all the elements of a complete abdominal ultrasound" and should have been billed as partial abdominal ultrasounds. (ECF No. 31-35, Marrero Aff. ¶ 18). The Government is not, however, seeking any damages here as a result of this apparent upcoding.

Here again, the Government presents evidence establishing that CPT 93970/93971 and CPT 93965 describe two different tests. From 2003 to 2009, the applicable CPT manuals described 93965 as "[n]on-invasive physiologic studies of extremity veins, complete bilateral study." (ECF No. 31-27, at 2, 4, 6, 8, 10, 12). By contrast, the same CPT manuals described CPT 93970 and CPT 93971 as "[d]uplex scan[s] of extremity veins including responses to compression and other maneuvers" that are performed either bilaterally or unilaterally. (*Id.*). Dr. Duszak explains that, although the two tests "involve evaluation of the same anatomic structures (*i.e.*, extremity veins)," noninvasive physiologic vascular studies are "distinctly different from duplex ultrasound[s]" because of the technology involved. (ECF No. 31-23, at 2-3). Indeed, Dr. Duszak represents that noninvasive physiologic vascular studies are rarely used in modern facilities because of the superiority of duplex ultrasound technology. (*Id.*). Dr. Duszak further opines that, in clinical practice, it is "exceedingly rare" to perform both tests on the same patient on the same date. (*Id.*). Dr. Duszak also states that it is "incorrect and inappropriate" to bill CPT code 93965 to "describe the compression and maneuvers performed as part of duplex ultrasound" tests billed as CPT 93970/93971. (*Id.* at 6).

Here again, Dr. Duszak's opinions are supported by the testimony of former CVC technicians. Ms. Mathews, the lead CVC

technician, represents that CPT 93970/93971 and CPT 93965 are different tests that "should only be billed together if there is a doctor's order for each." (ECF No. 31-16, Mathews Aff. ¶ 10). Additionally, three other former CVC technicians aver that they "never" performed plethysmographies, another name for the test described by CPT 93965. (ECF No. 31-19, Collins Aff. ¶ 7; ECF No. 31-20, Hudock Aff. ¶ 4; ECF No. 31-21, Newell Aff. ¶ 5).

Nonetheless, on 10,801 occasions during the period from 2004 through 2009, CVC requested reimbursement from Medicare for both CPT 93965 and CPT 93970/93971 for the same patient on the same date of service. (ECF No. 31-35, Marrero Aff. ¶ 13). Medicare paid out $588,521.61 for services billed as CPT 93965 as a result of these claims. (*Id.*). During the same period, CVC submitted 645 such requests to Medicaid, resulting in payments for CPT 93965 totaling $17,433.47. (ECF No. 31-32, Hammond Aff. ¶ 8). Based on an audit of the medical records associated with certain randomly selected claims, the Government concluded that "[t]here was no justification for any of the complete bilateral noninvasive physiological study of extremity veins (CPT code 93965) billed by CVC in the samples because there were no separate radiology reports for these services or any physician orders for these services." (ECF No. 31-35, Marrero Aff. ¶ 18).

### 4.   Dr. Fadul's Involvement

It is undisputed that Dr. Fadul is the sole owner and operator of CVC.   In this capacity, Dr. Fadul enrolled CVC in the Medicare program as an Independent Diagnostic Testing Facility ("IDTF") from at least 1999 to 2009.   (ECF No. 31-35, Marrero Aff. ¶ 22).   Doing so required Dr. Fadul to sign certain statements acknowledging his familiarity with Medicare laws and regulations and affirming his intent to abide by them.   (*See id.*; ECF Nos. 31-42, 31-43, & 31-44).   Dr. Fadul also agreed that he would not present or cause to be presented any false or fraudulent claims.   (ECF No. 31-43, at 2).

In their joint answer to the Government's original complaint (which, as discussed below, has now been superseded by an amended complaint), Dr. Fadul and CVC admitted some of the Government's allegations.   (ECF No. 14 ¶ 4).   Specifically, Defendants admitted (1) that CPT 76700 and CPT 76770 describe different tests; (2) that CVC automatically rendered bills for both codes when only the abdominal ultrasound was ordered and performed; (3) that Dr. Fadul "caused CVC to establish" these automatic combination billing practices; and (4) that Medicare and Medicaid paid CVC $166,858.55 for services billed as CPT 76770 that were not actually rendered.   (*Id.*).   At the same time, however, Dr. Fadul and CVC denied the more specific allegations relating to CPT 76700 and CPT 76770, including that

11

"Dr. Fadul was well aware that it was false and fraudulent to bill CPT 76700 together with 76770 absent an order from a physician calling for both tests." (*Id.*).  Dr. Fadul and CVC also denied all allegations regarding CPT 93965.  (*Id.*).

In addition to these contradictory admissions and denials, the record contains conflicting evidence about the extent of Dr. Fadul's involvement in instituting and maintaining the combination billing practices at issue.  In his interrogatory answers, Dr. Fadul represents that he "did not usually get involved in the actual billing" but instead entrusted responsibility for billing and CPT coding to Tina Hales, CVC's office manager, and Paula Price, CVC's marketing director who worked on a commission basis.  (ECF No. 31-3, at 6).[5]  Dr. Fadul also avers that "I believed we were in compliance with both State and Federal health laws in CVC's billing practices" based on his staff's yearly review of the new CPT manual and the software updates provided by Medical Mastermind.  (ECF No. 31-30, at 3-4).  Dr. Fadul also represents that Ms. Price "checked with several lawyers on many occasions to be sure we were in compliance with Medicare rules and regulations" and states that

---

[5] Dr. Fadul refers to CVC's marketing manager as "Paula Pincus" in his interrogatory answers.  (ECF No. 31-3, at 4-5). The court assumes that "Paula Pincus" is Paula Price, who the Government named as an additional defendant in its first amended complaint.  (*See* ECF No. 15).

"[t]he fact that [Ms. Price] was married to [a] judge and his circle are lawyers caused me to always be assured that we were in compliance." (*Id.* at 9).   Dr. Fadul further avers that he does "not know how to explain" the irregularities in CVC's billing codes, but notes that no similar issues were discovered in his personal practice, where no one worked on a commission basis.   (*Id.* at 6).   Ms. Price denies that she had any role in causing CVC's automatic combination billing practices.   (*See generally* ECF No. 25).

In contrast to Dr. Fadul's representations, the Government presents evidence that he was intimately involved in CVC's billing activities.   Ms. Hales avers that Dr. Fadul "was a hands on manager when it came to billing" in that he looked at all mail relating to billing, including denials of claims from insurance companies.   (ECF No. 31-4, Hales Aff. ¶ 15).   Some of the correspondence that Dr. Fadul reviewed was sent by CareFirst BlueCross BlueShield ("BCBS"), a private insurer.   (*Id.*).   In December 2004, BCBS placed CVC and Dr. Fadul's other clinics on pre-payment review because of questionable billing practices.   (ECF No. 31-12, Straight Aff. ¶ 4).[6]   Pre-payment review requires

---

[6] Specifically, BCBS had concerns that Dr. Fadul's entities were:   (1) billing for services that were not medically necessary; (2) upcoding their services (*i.e.*, billing for a higher level of service than was actually provided); and (3) unbundling their services (*i.e.*, billing separately for

a healthcare provider to submit documentation supporting the medical necessity of all services for which reimbursement is sought. (*Id.* ¶ 5). In CVC's case, BCBS retained medical experts to review the company's claims and then made payment decisions "on a case-by-case basis." (*Id.* ¶ 6).

When BCBS's experts reviewed the documentation supporting CVC's claims for both CPT 76700 (abdominal ultrasound) and CPT 76770 (retroperitoneal ultrasound), "it was clear that only an abdominal ultrasound had been requested and only an abdominal ultrasound had been performed." (ECF No. 31-12, Straight Aff. ¶ 7). Accordingly, BCBS reimbursed CPT 76700 and rejected CPT 76770. (*Id.*). The earliest written denial for CPT 76770 is dated October 8, 2008. (ECF No. 31-15, at 2). BCBS's pre-payment review of CVC's claims for both CPT 93970/93971 and CPT 93965 led to similar results: because the reviewing surgeon concluded that CPT 93965 was not medically necessary and had not actually been performed, BCBS reimbursed CVC only for CPT 93970/93971 and rejected payment for CPT 93965. (ECF No. 31-12,

---

individual components of a single service in order to increase payment from the insurer). (ECF No. 31-12, Straight Aff. ¶ 4). It is not clear, however, that the specific billing practices at issue in this lawsuit had any role in BCBS's initial decision to place Dr. Fadul's various practices on pre-payment review.

Straight Aff. ¶ 8).  The earliest written denial for CPT 93965 is dated July 22, 2008.  (ECF No. 31-14, at 1).[7]

The Government also presents evidence that CVC employees approached Dr. Fadul on at least three occasions to raise concerns about billing CPT 76770 with CPT 76700.  First, Ms. Hales avers that her predecessor, Lara Kinsey, "raised questions about billing" the two codes together with Dr. Fadul after

---

[7] In addition to the written denials, Charlotte Straight, a senior nurse audit specialist with BCBS, avers that she had multiple interactions with members of CVC's billing staff regarding CVC's "practice of routinely submitting codes for services that were neither ordered nor performed." (ECF No. 31-12, Straight Aff. ¶ 7).  As to the content and timing of these interactions, however, Ms. Straight avers that "[i]t is not possible to recall all of the contacts . . . because they were often part of conversations involving claims for multiple patients, some of which did not involve CVC services."  (*Id.* ¶ 10).  Ms. Straight did keep a case log relating to Dr. Fadul's various clinics, including CVC.  (*Id.* ¶ 5).  Based on this case log and her independent recollection, Ms. Straight testifies about a few specific conversations.  With respect to CPT 76770, Ms. Straight recalls that, on May 5, 2008, she spoke with Ms. Ayers (the office manager for Dr. Fadul's personal clinic) about billing for CPT 76770 when only CPT 76700 was ordered or reported.  (*Id.* ¶ 12).  In her case log notes, Ms. Straight recorded Ms. Ayers as stating that "Dr[.] Fadul says they have to bill that way and yells at them if they don't."  (ECF No. 31-13, at 58).  Ms. Straight also recalls that, on January 14, 2009, she reiterated to Kim Haynie in CVC's billing department that "CPT 76770 should only be submitted if that test had been requested and performed." (ECF No. 31-12, Straight Aff. ¶ 14). With respect to CPT 93965, Ms. Straight recalls that, "sometime in 2005," she told CVC office manager Chris Bowles that it was not appropriate to bill CPT 93965 with CPT 93970/93971.  (*Id.* ¶ 10).  Ms. Straight also recalls that she spoke with Ms. Haynie on May 23, 2006 and explained that it was "not appropriate" for CVC to consistently bill for CPT 93965.  (*Id.* ¶ 11).  Except as detailed below, it is not clear whether Dr. Fadul was personally aware of Ms. Straight's conversations with CVC staffers.

reviewing the CPT manual. (ECF No. 31-4, Hales Aff. ¶ 14). Dr. Fadul instructed Ms. Kinsey "to continue billing them together." (*Id.*). It is not clear when this exchange occurred, however; Ms. Hales avers only that it occurred "even before BCBS told us not to do this." (*Id.*). Second, Ms. Hales avers that, in 2007, Kim Haynie (a member of CVC's billing staff) told her and Dr. Fadul that BCBS had advised CVC that it could not bill for both CPT 76700 and CPT 76770 unless a physician ordered both tests. (ECF No. 31-4, Hales Aff. ¶ 12). According to Ms. Hales, Dr. Fadul responded by instructing CVC employees to "get an order for both studies." (*Id.* ¶ 12). After "it became clear that getting the order for both was not working," Dr. Fadul advised Ms. Hales to "continue to bill both codes and if BCBS denies 76770 to write it off." (*Id.*). Ms. Hales also testifies that CVC continued to bill both codes to Medicare "because Dr. Fadul said that if they were paying [the claims] they must be okay." (*Id.*). Third, Ms. Ayers recalls that, at some unknown date, she approached Ms. Hales and Dr. Fadul about billing CPT 76770 with CPT 76700 for tests performed in Dr. Fadul's personal clinics. (ECF No. 31-28, Ayers Aff. ¶ 5). Ms. Ayers represents that, notwithstanding BCBS's instructions to the contrary, "Dr. Fadul told me to continue to bill 76700 and 76770 when we did only an abdominal ultrasound." (*Id.*).

16

With respect to CPT 93965, Ms. Mathews – the head CVC technician – avers that, in July 2009, Dr. Fadul asked her about billing CPT 93965 with CPT 93970/93971. (ECF No. 31-16, Mathews Aff. ¶ 11). Ms. Mathews told Dr. Fadul that it was not correct to bill the codes together. (*Id.*). Ms. Mathews avers that someone at another mobile ultrasound company also told Dr. Fadul that it was inappropriate to bill the codes together. (*Id.*).

### B.   Procedural Background

On February 14, 2011, the Government filed suit against CVC and Dr. Fadul alleging two counts under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as well as common law claims for fraud, breach of fiduciary duty, unjust enrichment, and payment by mistake of fact. (ECF No. 1). On November 21, 2011, Dr. Fadul and CVC filed a joint answer, the contents of which are described above. (ECF No. 14). The next day, the Government filed an amended complaint adding Ms. Price, the former marketing director of CVC, as a defendant. (ECF No. 15). The amended complaint alleges that Ms. Price used her prior work experience with CPT codes to establish the fraudulent billing systems at CVC along with Dr. Fadul. (*Id.* ¶ 2).[8] On December

---

[8] The amended complaint also asserts that CVC violated the False Claims Act when Ms. Price knowingly used non-credentialed imaging technicians in violation of the Medicare regulations governing IDTF's. (ECF No. 15 ¶¶ 49-55). The Government does

27, 2011, Ms. Price answered the first amended complaint.  (ECF
No. 25).  Neither Dr. Fadul nor CVC filed an amended answer.

On May 18, 2012, the Government filed the instant motion
seeking summary judgment as to its False Claims Act counts
against Dr. Fadul and CVC and, in the alternative, as to its
common law counts for unjust enrichment and payment by mistake
of fact.  (ECF No. 31).[9]  Counsel for Dr. Fadul and CVC submitted
a letter indicating that neither Defendant would file an
opposition to the Government's motion.  (ECF No. 33).

## II.  Standard of Review

Summary judgment may be entered only if there is no genuine
issue as to any material fact and the moving party is entitled
to judgment as a matter of law.   Fed.R.Civ.P. 56(a); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*,
532 F.3d 291, 297 (4th Cir. 2008).   Summary judgment is
inappropriate if any material factual issue "may reasonably be
resolved in favor of either party."  *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash.*

---

not address these allegations in its motion for summary
judgment.

[9] The Government's motion does not seek any relief as to Ms.
Price.  On April 10, 2012, the Government submitted a status
report stating that "[t]he case against Paula Price has been
resolved."  (ECF No. 27).  To date, however, the Government has
not submitted a stipulation or request for dismissal of its
claims against Ms. Price in accordance with Fed.R.Civ.P. 41(a).

*Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  Where, as here, the nonmoving party fails to respond, the requested relief may not automatically be granted.  *See* Fed.R.Civ.P. 56(e)(2).  Rather, the court must "review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law."  *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

## III. False Claims Act

The Government first seeks summary judgment against Dr. Fadul and CVC with respect to its claims under two provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B).  Under Subsection 3729(a)(1)(A), a person is liable if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Under Subsection 3729(a)(1)(B), a person is liable if he "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[10]  In order to prevail under either of these

---

[10]  The Government apparently assumes that most recent version of the False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, 123 Stat. 1617 ("FERA"), applies here.  FERA renumbered the provisions of § 3729(a) and added a materiality requirement to what is now § 3729(a)(1)(B) (formerly § 3729(a)(2)).  There is some dispute over the retroactive effect of these amendments, particularly the new materiality requirement.  *See United States v. Kernan Hosp.*, 880 F.Supp.2d 676, 685 (D.Md. 2012)

provisions in the Fourth Circuit, the Government must show the following:

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct;
>
> (2) such statement or conduct was made or carried out with the requisite scienter;
>
> (3) the statement or conduct was material; and
>
> (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) (*"Harrison II"*).  As the Government does in its motion, each of these elements will first be analyzed with respect to CVC's liability as an entity.

### 1.  **Falsity**

To establish the first element under the False Claims Act, the alleged statement or conduct must represent an "objective

---

(summarizing split of authority).  For purposes of this action, it is not necessary to resolve this dispute because the court "can discern no material difference" among the different versions of the statute that might affect the outcome here.  *Id.* Moreover, even before FERA, the Fourth Circuit required a False Claims Act plaintiff to prove materiality.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999) (*"Harrison I"*) ("Liability under the False Claims Act is subject to the further, judicially imposed requirement that the false statement or claim be material.").

and verifiable falsehood." *United States v. Kernan Hosp.*, 880 F.Supp.2d 676, 688 (D.Md. 2012). "In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1266 (D.C.Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2$^d$ Cir. 2001)); *see also United States ex rel. Armfield v. Gills*, No. 07-cv-2374, 2013 WL 371327, at *3 (M.D.Fla. Jan. 30, 2013) (explaining that a request for reimbursement submitted to Medicare may be false if it seeks payment for services that "were not rendered as claimed") (internal quotation marks omitted).   Importantly, however, "imprecise statements or differences in interpretation growing out of a disputed legal question are . . . not false under the [False Claims Act]." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008) (internal quotation marks omitted).

Based on the present record, there is no genuine issue of material fact that, during the period from 2004 through 2009, CVC submitted objectively false claims to Medicare and Medicaid by requesting reimbursement for services that were never ordered or performed.   Specifically, the evidence shows that CVC submitted claims containing objective falsehoods when it requested reimbursement for both CPT 76700 and CPT 76770 on the

same date of service for the same patient when the test described by CPT 76770 (a retroperitoneal ultrasound) had not been ordered or performed.  Likewise, the evidence shows that CVC submitted claims containing objective falsehoods when it requested reimbursement for both CPT 93970/93971 and CPT 93965 on the date of service for the same patient when the test described by CPT 93965 (a non-invasive physiologic study of extremity veins) had not been ordered or performed.

Indeed, the Government provides ample evidence to support the falsity of CVC's claims.  First, the Government submits an expert report explaining that the CPT codes at issue here represent clinically distinct procedures that are rarely, if ever, performed on the same patient on the same date.  Second, the Government offers the testimony of former CVC employees establishing that they rarely performed the test described by CPT 76770 and never performed the test described by CPT 93965. Third, the Government offers the results of an audit of the medical records that correspond with certainly randomly selected claims submitted by CVC during the period from 2004 to 2009. For each of these claims, the Government concluded that CVC lacked justification for billing CPT 76770 or CPT 93965 because the tests described by those codes had not been performed.  By contrast, CVC fails to present any reasoned explanation that would justify seeking payment for these codes where the tests

they describe had not been ordered or performed. Thus, a reasonable jury could not find that CVC's billing practices were appropriate under these circumstances, and the Government satisfies its burden with respect to establishing falsity.

### 2. Scienter

To satisfy the second False Claims Act element, the Government must show that those responsible for submitting an objective falsehood acted knowingly in so doing. *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288 (4th Cir. 2002). The False Claims Act defines "knowingly" to mean that "a person, with respect to information":

> (i)   has actual knowledge of the information;
>
> (ii)  acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information[.]

31 U.S.C. § 3729(b)(1)(A). Thus, scienter can be established in any one of three ways (*i.e.*, proof of actual knowledge, deliberate ignorance, or reckless disregard) and does not require any "proof of specific intent to defraud." *Id.* § 3729(b)(1)(B). "Congress, however, has made plain its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex*

*rel. Owens v. First Kuwait Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (internal quotation marks omitted).

When the Government seeks to hold an entity liable under the False Claims Act, it cannot rely on the collective knowledge of the entity's agents to establish scienter. *See Harrison II*, 352 F.3d at 918 n. 9 (rejecting the plaintiff's attempt "to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials"); *Sci. Apps. Int'l*, 626 F.3d at 1274 (holding that "collective knowledge" is an "inappropriate basis for proof of scienter" in a False Claims Act case). Instead, the Government must prove an entity's scienter by demonstrating that a particular employee or officer acted knowingly. *See id.* That employee or officer need not be the same individual who submits the false claims. *See, e.g.*, *Harrison II*, 352 F.3d at 919 (rejecting a "single actor" theory); *United States v. Ed. Mgt. Corp.*, 871 F.Supp.2d 433, 452–43 (W.D.Pa. 2012) (same).

Here, the Government apparently seeks to pool together the collective knowledge of CVC's employees (including, for example, Dr. Fadul, Ms. Price, Ms. Hales, and others in CVC's billing department) to establish that CVC acted with actual knowledge or reckless disregard. (*See* ECF No. 31-1, at 31-32). Because the Fourth Circuit has rejected this type of "collective knowledge" approach, whether CVC as an entity acted with the requisite

scienter turns on whether Dr. Fadul possessed the requisite scienter, as he is the only individual who the Government contends acted knowingly.[11]

The Government attempts to establish that Dr. Fadul acted knowingly in two different ways. First, the Government contends that Dr. Fadul had actual knowledge of the falsity of CVC's claims based on: (1) his review of BCBS's denials of CVC's claims for CPT 76770 and CPT 93965 and (2) his conversations with CVC staffers about the propriety of billing for these two codes in combination with others. (ECF No. 31-1, at 33-34).

Although a reasonable fact finder could conclude that these communications provided Dr. Fadul with actual knowledge of the falsity of CVC's claims (or gave him reason to question the truth of CVC's claims), the problem with the Government's reliance on these events is largely one of timing. The Government seeks to recover for claims submitted by CVC during the entire period from 2004 until 2009, yet the events that allegedly gave rise to Dr. Fadul's actual knowledge occurred much later than 2004. For example, the earliest denial letters from BCBS are dated July 2008 (for CPT 76770) and October 2008 (for CPT 93965). Likewise, although the Government vaguely

_____

[11] In the second amended complaint, the Government alleges that Ms. Price also acted knowingly, but does not raise this argument in its motion.

asserts that the relevant conversations between Dr. Fadul and his staff occurred "[o]n more than one occasion over the years from 2004 to 2009," the record shows that the earliest of these conversations actually occurred well after 2004. (ECF No. 31-1, 34). As described above, the earliest conversation about CVC's billing of abdominal ultrasounds that directly involved Dr. Fadul occurred at some point in 2007, when Ms. Haynie approached him about her conversations with BCBS.[12] The only conversation involving Dr. Fadul regarding billing for duplex ultrasound tests occurred in July 2009 (when Dr. Fadul asked Ms. Mathews her opinion about billing for CPT 93975 with CPT 93970/93971).

Additionally, although the Government refers to Dr. Fadul as the "driving force" of CVC's improper billing practices and insinuates that Dr. Fadul had an active role in configuring the Medical Mastermind software to bill automatically for CPT 76770 and CPT 93965, the record is devoid of any testimony from CVC employees corroborating these assertions. Indeed, all that supports the Government's characterization of Dr. Fadul's role are Dr. Fadul's admissions in his answer that he "caused CVC to

---

[12] Certain testimony indicates that Dr. Fadul participated in similar conversations at an earlier date, but – like the Government's brief – this testimony is exceedingly vague regarding timing. Ms. Hales, for example, avers that her predecessor approached Dr. Fadul about billing for both CPT 76700 and CPT 76770 "even before BCBS told us not to do this," but it is not clear when this conversation occurred. (ECF No. 31-4, Hales Aff. ¶ 14).

establish systems by which CVC would automatically render bills for both CPT 76700 and for 76770 when only the abdominal ultrasound was ordered and performed" and "caused CVC to bill and collect from Medicare and Medicaid $166,858.55 for services not rendered" as a result of this billing practice. (ECF No. 14 ¶ 14). Yet at the same time, Dr. Fadul denied all of the Government's remaining allegations of fraud and then later provided interrogatory answers in which he disclaimed any active role in CVC's billing practices.

Notwithstanding these evidentiary deficiencies, a reasonable jury could conclude that Dr. Fadul had actual knowledge of the falsity of CVC's claims for the entire period from 2004 to 2009. Yet to do so would require making a number of inferences based on circumstantial evidence. Accordingly, it cannot be said, as a matter of law, that Dr. Fadul possessed actual knowledge throughout the period in question.

The Government alternatively contends that, at a minimum, Dr. Fadul demonstrated reckless disregard as to the truth or falsity of CVC's bills by failing to take reasonable steps to ensure the bills' accuracy. (ECF No. 31-1, at 34-35).[13] Courts have construed the reckless disregard standard under the False

_____

[13] The Government does not expressly argue that Dr. Fadul acted with deliberate ignorance, the intermediate standard for establishing scienter under the False Claims Act.

Claims Act as "an extreme version of ordinary negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C.Cir. 1997) (observing that, although the statute "was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government") (internal quotation marks omitted). In *Krizek*, the D.C. Circuit affirmed the trial court's conclusion that a physician displayed reckless disregard by "fail[ing] utterly" to review bills submitted on his behalf to Medicare where "even the shoddiest recordkeeping would have revealed" that the claims sought reimbursement for an excessive number of patient care hours – in some cases, in excess of 24 hours for a single day. *Id*.

Similarly, in *United States v. Stevens*, 605 F.Supp.2d 863, 867 (W.D.Ky. 2008), the court considered whether a physician displayed reckless disregard as to the truth or falsity of claims submitted on his behalf. There, the defendant physician used a new machine to provide a test that did not correspond to any current CPT code. Initially, the physician's requests for reimbursement for these tests were rejected by his patients' insurance companies. The physician then "completely delegated" all billing responsibilities to someone with "absolutely no prior experience with medical billing," after which the insurers

28

began remitting payment. *Id.* at 869. The physician admitted that he took no steps to ensure that his bills were accurate and never asked what codes were being billed, but instead "simply assumed the claims were correct because they were being paid." *Id.* Thus, the court concluded that the physician displayed "reckless disregard" by ignoring his duty as a Medicare and Medicaid provider to "take reasonable steps to ensure that his clinic's claims for reimbursement [were] accurate." *Id.*

Although seemingly apposite, *Stevens* and *Krizek* do not require entry of summary judgment in favor of the Government here. First, in *Krizek*, the district court reached its finding regarding scienter after a three-week bench trial where the evidence showed an "utter failure" by the defendant physician to review the false claims at issue. Here, by contrast, the Government seeks to establish scienter at the summary judgment stage. Typically, however, "when the issue turns on the defendant's intent or scienter, summary judgment for the plaintiff is inappropriate." *United States v. Taber Extrusions, LP*, 341 F.3d 843, 845-46 (8th Cir. 2003) (reversing district court's entry of summary judgment in favor of Government in a False Claims Act case because although the Government "certainly has evidence creating the requisite inference" to support scienter, the defendant "presented contrary evidence").

Although *Stevens* was decided at the summary judgment stage, it was undisputed there that the physician "took no other steps whatsoever" to fulfill his duty to ensure the accuracy of his bills; indeed, there was "not a shred of evidence to suggest that [the physician] did anything to make sure his billings were correct." *Stevens*, 605 F.Supp.2d at 869.   In light of this undisputed evidence, the court rejected the physician's arguments that "he had a good faith belief that his reimbursement requests were properly submitted." *Id.* at 867.

Here, the record contains evidence (albeit thin) that Dr. Fadul did take certain steps in connection with CVC's billing activities.  For example, Dr. Fadul represents that, although he delegated responsibility for billing to Ms. Hales and Ms. Price, he was "assured that we were in compliance" with applicable rules and regulations based on Ms. Price's connections and her consultations with legal advisors.  (ECF No. 31-3, at 9).   Dr. Fadul also represents that he instructed Ms. Ayres to purchase the new CPT manuals each year so that CVC's billing staffers could review for new changes and ensure CVC's compliance with the manuals.   (ECF No. 31-30, at 4).   Finally, Dr. Fadul represents that he based his belief that CVC was in compliance with applicable rules and regulations based on the regular software updates provided by Medical Mastermind, which apparently included updates to CPT codes.  (*Id.*).

A jury may ultimately find that Dr. Fadul's actions are not the type of "reasonable steps" that fulfilled his duty, as the sole owner and operator of a Medicare and Medicaid provider, to ensure the accuracy of CVC's reimbursement requests. Indeed, the Government's evidence that Dr. Fadul specifically instructed CVC staffers to continue the billing practices even after receiving information that it was improper to do so strongly suggests that Dr. Fadul's actions cannot be construed as such. Yet given the discrepancies in the record as to extent and timing of Dr. Fadul's role in CVC's billing practices and the general preference for allowing the issue of scienter to be decided by a fact finder, it is not appropriate to reach such a conclusion without the aid of a jury. *See, e.g.*, *United States ex rel. Schaefer v. Conti Med. Concepts, Inc.*, No. 3:04-CV-400, 2009 WL 5104149, at *6 (W.D.Ky. Dec. 17, 2009) (although the evidence of the healthcare provider's scienter "strongly favors the government and may likely aid in getting a jury verdict . . . it does not warrant summary judgment").

Because genuine issues of material fact remain as to the necessary element of scienter, the Government's motion for summary judgment must be denied as to its False Claims Act counts against CVC. The same conclusion likewise bars summary judgment on the Government's statutory claims against Dr. Fadul in his individual capacity.

IV.   **Common Law Claims**

The Government alternatively contends that, "[i]n the event that the Court might determine that summary judgment on the False Claims Act claims is not appropriate," it is entitled to summary judgment on its common law claims for unjust enrichment and payment under mistake of fact. (ECF No. 31-1, at 36).

A.    **Payment By Mistake of Fact**

A claim for payment by mistake of fact allows the Government to "'recover funds which its agents have wrongfully, erroneously, or illegally paid.'"  *United States v. Medica-Rents Co.*, 285 F.Supp.2d 742, 776 (N.D.Tex. 2003) (quoting *United States v. Wurts*, 303 U.S. 414, 415 (1938)).   The claim is "available to the United States and is independent of statute." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970); *see also United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 16 n. 16 (1st Cir. 2005) (explaining that the Government's "power to collect money wrongfully paid" is part of the United States' "inherent authority") (internal quotation marks omitted).   Where it seeks to recover payments made as a result of false claims, the Government must show that it "made . . . payments under an erroneous belief which was material to the decision to pay." *Mead*, 426 F.2d at 124 (citing *Wurts*, 303 U.S. at 414).

Notably, "[k]nowledge of falsity is not a requisite for recovery under the mistake doctrine."  *Mead*, 426 F.2d at 125 n.

6.[14] Thus, even where it cannot establish that a defendant acted knowingly for purposes of the False Claims Act, the Government may be entitled to recovery under the alternative theory of payment by mistake of fact. *See, e.g., id.* (although the Government failed to establish that the defendant acted knowingly in submitting false claims that "overstated his actual charges," it was still entitled to reimbursement of the overcharges pursuant to its claim for payment by mistake of fact); *cf. United States v. Khan*, No. 03cv74300, 2009 WL 2461031, at *5 (E.D.Mich. Aug. 5, 2009) (entering summary judgment on the Government's payment by mistake claim as an alternative holding in the event that amounts awarded under the False Claims Act were "subsequently be found to be legally unsustainable"); *United States v. Bellecci*, No. 05cv1537, 2008 WL 802367, at *4-5 (E.D.Cal. Mar. 26, 2008) (observing that the Government could be entitled to summary judgment on its claim

---

[14] The Ninth Circuit decided *Mead* before Congress amended the statutory language of the False Claims Act to make clear that proof of a specific intent to deceive is not needed to establish scienter. *See United States ex rel. McCoy v. Calif. Med. Review, Inc.*, 723 F.Supp. 1363, 1370 (N.D.Cal. 1989) (explaining that the 1986 amendments to the False Claims Act superseded the holding of *Mead* that proof of specific intent to defraud is required). Although it is now easier to prove scienter under the False Claims Act, *Mead* nonetheless establishes that when the Government is unable to make such a showing (even under the lower standards of deliberate ignorance or reckless disregard), the doctrine of payment by mistake of fact may still be available as an alternative basis of recovery.

for payment by mistake of fact even where it had implicitly "retract[ed]" its allegations that the defendant was intentionally deceptive in submitting claims to the Government).

Here, it is undisputed that, during the period from 2004 to 2009, Medicare and Medicaid reimbursed CVC for CPT 76770 on 2,292 occasions and for CPT 93965 on 11,446 occasions. It is also undisputed that Medicare and Medicaid issued these reimbursements based on a belief that CVC had requested payment only for services it had actually rendered. The Government offers ample evidence to demonstrate that this belief was erroneous because CVC regularly requested reimbursement for tests that it never performed. It is also clear that this belief was material to Medicare's and Medicaid's decision to pay – in other words, the Programs would not have remitted payment but for their reliance on the accuracy of CVC's bills. Thus, because there is no dispute that the Government would not have reimbursed CVC for CPT 76770 or CPT 93965 had the Government known that CVC never performed the tests described by these codes, the Government is entitled to recover the amounts mistakenly paid to CVC.

The question remains as to whether Dr. Fadul is jointly liable for such amounts in his individual capacity. The *Mead* court recognized that the Government is entitled to obtain repayment from anyone "into whose hands the mistaken payments

flowed," including third parties who did not directly receive the mistaken payments but nonetheless participated somehow in the transaction and "received benefits as a result" thereof. *Mead*, 426 F.2d at 124-25; *see also LTV Educ. Sys. Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989) ("[T]he government is entitled to obtain repayment from a third party into whose hands the mistaken payments flowed where that party participated in and benefitted from the tainted transaction."). At least one court has held that an officer of a healthcare corporation was individually liable under a payment by mistake of fact theory where he (1) signed the false certifications submitted by the entity to Medicare that caused the mistaken payments and (2) received tangible benefits from the payments in the form of his corporate salary. *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, No. 02-2199, 2008 WL 2945946, at *7 (W.D.La. July 25, 2008).

Here, for the reasons discussed above, the record contains discrepancies regarding the nature and extent of Dr. Fadul's participation in CVC's submission of false claims. Moreover, unlike in *Aging Care*, the Government presents no evidence regarding what benefits Dr. Fadul personally derived from the mistaken payments. It is not enough to assume that Dr. Fadul received a personal benefit because he is the only member and officer of CVC. The wrongfully paid reimbursements may have

been used for other purposes (*e.g.*, paying the salaries and commissions of CVC employees; compensating the third-party technicians and radiologists; and any number of operating expenses). Moreover, the Government does not advance any arguments that would justify piercing the corporate veil based on the theory that CVC functioned merely as Dr. Fadul's alter ego. *See, e.g., Baltimore Line Handling Co. v. Brophy*, 771 F.Supp.2d 531, 552 (D.Md. 2011) (observing that, in Maryland, "the fiction of the wholly separate corporate form is jealously guarded" and that a "herculean" effort is required to pierce the corporate veil). Thus, the Government fails to establish that Dr. Fadul should be held liable in his personal capacity for the mistaken payments remitted to CVC.

As to damages, the Government is entitled to recover from CVC all amounts that Medicare and Medicaid mistakenly paid.[15]

---

[15] By contrast, if the Government had established that CVC violated the False Claims Act, CVC would be liable for treble damages (*i.e.*, three times the amount paid by Medicare and Medicaid as a result of the false claims) as well as a civil penalty of "no[t] less than $5,500 and no more than $11,000" for "*each* false claim." *United States ex rel. Bunk v. Birkart Globistics GmbH & Co.*, Nos. 02cv1168 AJT, 07cv1198 AJT, 2012 WL 488256, at *4 (E.D.Va. Feb. 14, 2012) (citing *Harrison I*, 176 F.3d at 786) (emphasis added). Here, the Government maintains that CVC submitted 13,738 false claims to Medicare and Medicaid, and seeks the maximum penalty of $11,000 for each claim. It is questionable whether this request – which, by the court's calculation, would amount to a civil penalty of $151,118,000.00 – could withstand constitutional scrutiny. *See id.* (holding that a mandatory civil penalty under the False Claims Act of at

The Government presents two arguments regarding damages. First, the Government argues that its actual damages for the period from 2004 to 2009 total $814,315.70. This figure assumes the falsity of each of the claims submitted by CVC during this period that sought reimbursement either for the combination of CPT 76700 and CPT 76770 or for the combination of CPT 93970/93971 and 93965. (ECF No. 31-1, at 43). The Government argues that this assumption is reasonable because, based on the results of its audit, "[t]here is no reason to believe that the record" would justify "any other instance where CVC billed CPT 76770 or 93965." (*Id.* at 45).

The Government alternatively offers damages calculations based on a "statistical sampling and extrapolation" approach. (*Id.* at 46-49). Recognizing that it was unable to obtain the medical records associated with 152 of the 551 claims in its statistically valid random samples, the Government retained several statisticians to extrapolate two different overpayment scenarios. Under the first scenario, the statistician assumed that all of the claims lacking medical records were false. In other words, the first scenario assumed that all of the 551 claims in the statistically valid random samples lacked

---

least $50,248,000 "constitutes an unconstitutionally excessive fine in violation of the Eighth Amendment"). Given the conclusions set forth above, however, is not necessary to address this issue.

justification for billing CPT 76770 or CPT 93965.  (ECF No. 31-45, Kozarev Aff. ¶ 11).   After applying standard sampling formulas, the statistician projected overpayment under this scenario to equal $682,947.74.  (*Id.*).  Under the second scenario, the statistician assumed that the medical records for the 152 missing claims included justification for billing CPT 76770 or CPT 93965, resulting in a projected overpayment of $415,687.01. (*Id.* ¶ 12).

Based on a thorough review of the Government's damages evidence, the extrapolated total of $682,947.74 represents the soundest measure of damages.[16]  Courts have routinely endorsed sampling and extrapolation as a viable method of proving damages in cases involving Medicare and Medicaid overpayments where a claim-by-claim review is not practical.  *See, e.g., Ill. Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir. 1982) (where a claim-by-claim review is a practical impossibility, it is reasonable to use statistical samples to audit claims to arrive at a rebuttable initial decision regarding damages);

---

[16] Although the higher figure of $814,315.70 is arguably justified, there is some evidence in the record that precludes a blanket assumption that every single claim submitted by CVC during the relevant period was false.  For example, the former CVC technicians aver that it was rare for a physician to order both an abdominal ultrasound and a retroperitoneal ultrasound for the same patient but stop short of testifying that they never performed both tests.  Thus, it is preferable to use the extrapolated damages figure that makes some allowance for sampling errors.

38

*Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 89-90 n. 7 (2[d]
Cir. 1991) (use of statistical sampling and extrapolation to
calculate overcharges does not violate a defendant's due process
rights "[g]iven the low risk of error and the government
interest in minimizing administrative burdens").   As in those
cases, the Government provides detailed descriptions of its
audit, sampling, and extrapolation methods, including numerous
affidavits and supporting documentation.   CVC, by contrast,
fails to raise any challenge to the methods used by the
Government, despite having ample time and opportunity to do so.
Thus, judgment will be entered against CVC and in favor of the
Government in the amount of $682,947.74.

> B.   **Unjust Enrichment**

In light of the conclusions above, there is no need to
address the Government's common law claim for unjust enrichment,
which is duplicative of its claim for payment by mistake of fact
and seeks the same relief.   *See, e.g.*, *United States v.
Albinson*, No. 09-1791, 2010 WL 3258266, at *18 (D.N.J. Aug. 16,
2010) ("Payment under mistake of fact and unjust enrichment are
essentially duplicative and seek the same relief."); *United
States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505
F.Supp.2d 20, 23-24 (D.D.C. 2007) (same).

**V.    Conclusion**

For the foregoing reasons, the motion for summary judgment filed by the Government will be granted in part and denied in part.[17]  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[17] Because many of the claims asserted by the Government in its first amended complaint remain, it would be premature at this stage to rule on the Government's request for pre-judgment interest.